UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL PERRY OSWALD,

                    Plaintiff,

          v.                                          Case No. 16-cv-991-pp

JEFFREY MANLOVE, *et al.*,

                    Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 97) AND GRANTING
PLAINTIFF'S MOTIONS TO APPOINT COUNSEL (DKT. NOS. 131, 133)**

The plaintiff, who is representing himself, filed this lawsuit under 42

U.S.C. §1983. Dkt. No. 1. About four months later, the court allowed the

plaintiff to amend his complaint. Dkt. No. 27. The court screened the amended

complaint and allowed him to proceed on (1) deliberate indifference to medical

needs claims against defendants Jeffrey Manlove, Belinda Schrubbe, Kristine

DeYoung, Carol Al-Rahrawy and Tammy Westphal; (2) deliberate indifference to

conditions of confinement claims against defendants Josh Bleiler, Erik

Marwitz, Timothy Price, Brian Schmidt,[1] Micah Moore and Joseph Beahm; (3)

───────────────

[1] When the court screened the plaintiff's amended complaint, he did not know
the names of all the defendants, so he used John and Jane Doe placeholders.
Dkt. No. 27. On May 23, 2017, the plaintiff filed a motion asking, among other
things, to substitute J. Bleder (correctly spelled Bleiler), E. Marwitz, M. Moore,
J. Beahm, T. Price and B. Schmidt for the John Doe placeholder. Dkt. No. 60 at
¶¶4-8. The court granted the plaintiff's request to substitute on June 12, 2017;
however, it mistakenly failed to include T. Price and B. Schmidt in the order.
Dkt. No. 64 at 2, 4 (granting the plaintiff's motion to substitute the names he
provided for the Doe placeholders, yet specifying only that "J. [Bleiler], E.
Marwitz, M. Moore, and J. Beahm" be substituted for the Doe placeholder). The
parties appear not to have noticed the court's omission (or they noticed it but

1

a state law medical malpractice claim against Manlove, Schrubbe and DeYoung; and (4) a state law negligence claim against Al-Rahrawy and Westphal. Dkt. No 27.

The defendants filed a motion for summary judgment, which is fully briefed.

## I. RELEVANT FACTS[2]

During the time of the events at issue, the plaintiff was incarcerated at Waupun Correctional Institution. Dkt. No. 117 at ¶1. Manlove was a physician; Schrubbe was the Health Services manager; DeYoung was a registered nurse; Al-Rahrawy and Westphal were licensed practical nurses; and Bleiler, Marwitz, Moore, Price, Schmidt and Beahm were officers who worked in the Restricted Housing Unit (RHU). Id. at ¶¶2-7.

### A. The Plaintiff's Elevator Pass Claim

On October 1, 2014, the plaintiff received a Special Needs Restriction for a lower tier and an elevator pass. Id. at ¶21. The defendants explain that the

_____

did not bring it to the court's attention) because on August 7, 2017, the defendants—including Price and Schmidt—answered the amended complaint, and on November 6, 2017, they filed a motion for summary judgment. Dkt. Nos. 90, 97. Given that Price and Schmidt have answered the amended complaint and the parties have briefed the plaintiff's claims against them, the court now formalizes the assumption under which everyone has been operating—that Price and Schmidt are defendants.

[2] The court takes the relevant facts from the plaintiff's amended complaint, dkt. no. 28, the "Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact," dkt. no. 117, and the "Declaration of Daniel Perry Oswald," dkt. No. 113, respectively. The facts are undisputed unless the court indicates otherwise.

Special Needs Committee approved the restrictions to address the plaintiff's vertigo/dizziness. Id. at ¶22. The plaintiff states his vertigo was only part of the reason he received the pass; he also received the pass to address his "debilitating back condition." Dkt. No. 113 at ¶22. According to the plaintiff, two months earlier, an off-site specialist had recommended that the institution house the plaintiff on a lower tier and that it allow him to use the elevator. Dkt. No. 117 at ¶29; Dkt. No. 113 at ¶29. The plaintiff says that the off-site specialist issued the order on August 1, 2014, stating that the plaintiff should stay on a lower tier "until 'FURTHER NOTICE.'" Dkt. No. 113 at ¶29. In a footnote in their reply brief, the defendants maintain that the order was to remain in place "until further workup." Dkt. No. 118 at 2, n.1. In support of their version of what the off-site specialist said, the defendants cited their reply to the plaintiff's response to their proposed findings of fact, Dkt. No. 117 at ¶¶28-29. Notably, however, the reply makes no mention of *either* the plaintiff's "until further notice" language or the defendants' "until further workup" language.

The defendants attached certain medical records to defendant Manlove's declaration. Dkt. No. 100-1. The records include a report from Dr. Raymond J. Hah, dated August 1, 2014. Dkt. No. 11-1 at 257-258. In the section captioned "ASSESSMENT," the reported stated,

> Will continue with anti-inflammatory medications, a course of physical therapy, and tramadol as well as downgrading his tier level to assist him with some of his ADL[3] requirements. We will order an

---

[3] Activities of daily living.

MRI of the lumbar spine and see him back in 2-3 months to review those results. . . . At this point, my plan is to manage him conservatively, see how his symptoms go, and see if on his next visit he would benefit from an epidural steroid injection based on the location of his maximal stenosis.

Dkt. No. 100-1 at 258. Neither the words "until further notice" or "until further workup" appear in the three-page report.

At the time the Special Needs Committee gave him the pass, the plaintiff was living in general population, which, according to the defendants has a lot of stairs. Dkt. No. 117 at ¶¶21, 16. Some areas of the general population units do not have elevators (there is no elevator to get from the cell hall to the chapel, for example, or to the cafeteria). Id. at ¶17. The plaintiff agrees that there are a lot of stairs in general population, but he clarifies that the areas without elevator access that he frequented (the showers and the cafeteria) had only one or two stairs. Id. at ¶16; Dkt. No. 113 at ¶16. He says he didn't go to chapel or recreation because of the lack of accommodations. Id.

About a month after receiving the elevator pass, on November 7, 2014, the plaintiff had another appointment with the off-site specialist. Dkt. No. 117 at ¶27. Prior to the appointment, the specialist ordered the plaintiff to undergo an MRI, which he did. Id. at ¶28. At the appointment, the specialist noted that the plaintiff's left leg symptoms had improved somewhat, but that the plaintiff was complaining of a significant spasm in his low back, particularly at night. Id. He also noted that the plaintiff appeared to be in no acute distress, that he arose easily from the chair, and that he walked freely into the room. Id. The

specialist acknowledged that the plaintiff had difficulty with heel and toe walking due to pain, but that he had "5 out of 5" for strength in his legs. Id.

The specialist recommended a trial of epidural steroid injections, increasing the plaintiff's gabapentin dosage at bedtime, a muscle relaxer at bedtime, and to follow up in three to four months. Id. at ¶29. According to the defendants, the specialist did not recommend a lower tier restriction as he had in August, did not recommend that the plaintiff take the elevator instead of the stairs and did not say that the plaintiff was "physically incapable of taking the stairs." Id. The plaintiff disputes the defendants' interpretation of the specialist's order. He asserts that the November order should have been read as a supplement to the August order because the specialist did not redact or specifically revise the August order and because the August order was to continue "until further notice." Dkt. No. 113 at ¶29.

About a week after his November appointment with the specialist, the plaintiff was placed in the RHU. Dkt. No. 117 at ¶30. The RHU has far fewer stairs than general population; there are only about eight stairs that inmates must navigate. Id. at ¶31. A staff member always escorts inmates in the RHU. Id. at ¶32. Within a few days, security officers contacted HSU manager Schrubbe and asked her if the plaintiff had a medical need for an elevator pass. Id. at ¶33. The defendants say that, while there are elevators in the RHU, they typically are used to deliver meals and supplies and transport wheelchair bound inmates. Id. at ¶34. The plaintiff disagrees, asserting that the RHU

elevators were used to transport inmates with disabilities. <u>Id.</u>; Dkt. No. 113 at ¶34.

Schrubbe reviewed the plaintiff's file and discontinued his elevator pass, effective November 17, 2014. <u>Id.</u> at ¶36. According to the defendants, she made this decision for four reasons: 1) nothing in the specialist's November 2014 recommendation indicated that the plaintiff was physically incapable of using the stairs, dkt. no. 117 at ¶37; 2) the advanced care providers at the health services unit believed that the plaintiff was physically capable of using the stairs, dkt. no. 117 at ¶38, and, in October 2014, someone (the defendants do not identify who) observed the plaintiff carrying his mattress and sheets on his back down the stairs to a lower-tier cell, dkt. no. 117 at ¶39; 3) the number of stairs in the RHU was limited, especially compared to the stairs in general population, dkt. no. 117 at ¶40; and 4) in RHU, the plaintiff would be transported with a hands-on-escort, so there would always be at least one officer to assist the plaintiff gain his balance, dkt. no. 117 at ¶41.

The plaintiff disagrees with Schrubbe's interpretation of the specialist's order. Dkt. No. 113 at ¶37. As noted above, he argues that the November order supplemented the August order; it did not replace it. <u>Id.</u> He further asserts that the only advanced care provider in health services who had an informed opinion of his capacity to take the stairs was Manlove, and Manlove told him that he would have approved an elevator pass. <u>Id.</u> at ¶38. The plaintiff also denies that that he carried his mattress down the stairs. <u>Id.</u> at ¶39. He explains that he had been housed in a lower-tier cell for two months by that date, so it

wouldn't make sense that he'd be transporting his mattress down the stairs, and he says he wasn't moved near that time. Id. Next, he asserts that there were about five to six feet of stairs he had to navigate to get to medical appointments, visits and the showers. Id. at ¶40. Finally, the plaintiff asserts that he had no reason to think the correctional officers would catch him if he fell, because in June 2014 he was being transported from one location to another and a correctional officer allowed him to fall face-first down some fifteen stairs. Id. at ¶41.

When the plaintiff rejoined general population, he was again permitted to use an elevator pass. Dkt. No. 117 at ¶42.

B.    *The Plaintiff's Special Needs Claim*

On September 5, 2014, Manlove signed a medical restrictions/special needs form that allowed the plaintiff to have an extra bath towel, extra washcloth, briefs (also referred to as adult underwear) and clean bedding as needed for his urinary incontinence issues. Id. at ¶43. The restriction was to be in effect until December 5, 2014. Id. at ¶44. A little less than a month later, on October 1, 2014, Schrubbe, who was a member of the Special Needs Committee, updated the medical restriction/special needs form and approved Manlove's recommendation. Id. at ¶45. According to the defendants, Department of Corrections policy requires inmates ask the Special Needs Committee to update special needs restrictions at least thirty days prior to the restriction expiring. Id. at ¶46. The plaintiff explains that he did not know this was the policy; he also notes that he notified Manlove in person on November

21, 2014, that his restrictions were set to expire in about two weeks. Dkt. No. 113 at ¶47.

DeYoung received a call from RHU security staff on December 5, 2014 (the day the restrictions expired), informing her that the plaintiff was claiming to have a linen exchange restriction, but that it had either expired or was not in the system. Dkt. No. 117 at ¶48. The plaintiff asserts that he also spoke to DeYoung in person that day about his restrictions expiring. Dkt. No. 113 at ¶48. According to the defendants, DeYoung entered a temporary order extending the plaintiff's linen exchange to March 2015, until the Special Needs Committee could review and approve the order. Dkt. No. 117 at ¶49. The defendants indicate that DeYoung sent the updated restriction to RHU, but that the restriction did not make it into the binder or WICS (the electronic log). Id. at ¶¶50, 69. The plaintiff disputes that DeYoung placed the order; he questions why the order is not in WICS and argues that she created the document after-the-fact. Dkt. No. 113 at ¶50.

On December 5, 2014, the plaintiff filled out a health services request asking for his pillow, extra linen, cane, ice bag and briefs to be extended; he noted that these items expired on that day. Dkt. No. 117 at ¶51. According to the defendants, health services received the request three days later. Id. The defendants highlight that the request did not state that officers were refusing to provide the plaintiff with these items (though elsewhere they assert that policy compelled refusal of such requests), nor did his request inform health services that he was sleeping in urine-soiled sheets, blankets and clothing. Id. at ¶51.

8

The plaintiff explains that he did not need to inform health services that he was wetting himself because his condition was well known. Dkt. No. 113 at ¶51.

On December 10, 2014—two days after the date on which the defendants indicate they got the plaintiff's first HSU request—health services received another request from the plaintiff explaining that his restrictions had not been updated. Dkt. No. 117 at ¶52. Health services (the defendants do not specify who) forwarded the request to the Special Needs Committee. Id. According to the defendants, the plaintiff did not notify Manlove, Schrubbe, DeYoung or the Special Needs Committee that he was sleeping on urine-soiled bedding until December 17, 2014. Id. at ¶53. The plaintiff doesn't dispute that he didn't specifically notify them that he was sleeping on urine-soiled bedding and clothes, but he clarifies that he told Manlove his restrictions were about to expire on November 21, 2014, and on December 5 he told DeYoung his restrictions had expired. Dkt. No. 113 at ¶53, 48, 47.

Schrubbe states that, as soon as she learned on December 17, 2014, that the plaintiff was sleeping on urine-soiled linen, she updated the special needs restrictions that same day, and the plaintiff received clean linens. Dkt. No. 117 at ¶54. Manlove, Schrubbe and DeYoung state that they did not know prior to December 17, 2014, that the December 5, 2014 order was not being followed, or that the plaintiff claimed that he wasn't getting clean linens. Id. at ¶55.

Regarding the plaintiff's complaints about not receiving new briefs (adult diapers), the defendants indicate that he asked for a refill on November 3,

2014, and that this request was filled the next day, id. at ¶56; he asked again on December 25, 2014, and that request was filled three days later, id. at ¶58. The defendants assert that the package the plaintiff received on November 4, 2014 contained eighteen briefs, id. at ¶56, and they state that inmates are told to request refills five to seven business days before running out; that information is also in the inmate handbook. Id. at ¶57. The plaintiff explains that, if he did not soil a brief, he would wear it for multiple days, so sometimes a package of eighteen could last a month or two. Dkt. No. 113 at ¶56.

C.     *The Plaintiff's Conditions of Confinement Claim*

The institution gives inmates two sheets, one hand towel, one face cloth and one pillowcase, which the inmates can exchange every Sunday. Dkt. No. 117 at ¶59. Inmates can exchange their blankets twice per year—a "one-for-one" exchange where the inmate can receive up to two blankets. Id. at ¶60. The institution allows inmates to exchange their linens or blankets more frequently if they have a restriction from the Special Needs Committee and/or health services. Id. at ¶61. Security staff are authorized to do more frequent linen or blanket exchanges only if there is a medical restriction. Id.

Medical restrictions are stored in a binder that is in the sergeant's office. Id. at ¶63. The information is also in the WICS computer program. Id. The binder and WICS contain the medical restrictions for all inmates in RHU. Id.

When an inmate with a medical restriction needs a linen or blanket exchange, it is the inmate's responsibility to contact security staff, who check the binder to confirm the inmate has a restriction. Id. at ¶64. If there is no

restriction noted in the binder, security staff instruct the inmate to contact the Special Needs Committee or health services. Id. at ¶65. Under those circumstances, policy does not permit security staff to exchange an inmate's linen. Id. Nevertheless, according to the defendants, if an inmate shows them that his linen or blankets are soiled, they given him fresh linen and blankets "as needed." Id. at ¶66. The defendants explain that, if an inmate has soiled linens or blankets, it jeopardizes the health and safety of everyone on the unit—inmates and staff. Id. at ¶67.

The plaintiff asserts that on December 9, 2014, while at the showers, he asked Bleiler for clean linen. Dkt. No. 117 at ¶¶73-74; Dkt. No. 113 at ¶¶73, 74. The defendants don't appear to dispute this, but argue that because this conversation took place at the showers, Bleiler could not see the plaintiff's linens. Dkt. No. 117 at ¶74. The plaintiff alleged in his amended complaint that two days later, on December 11, 2014, he again awoke to soiled sheets, underwear and blanket. Dkt. No. 28 at ¶41. He told Marwitz, id. at ¶42; Dkt. No. 60 at ¶5 (identifying Marwitz as the officer involved in this incident). The plaintiff asserts that Marwitz told him that because there was no longer an approved special needs slip, Marwitz could not replace the soiled linens. Dkt. No. 113 at ¶76.

On that same date—December 11, 2014—Price and Schmidt were working in the control center. Dkt. No. 117 at ¶¶77. The plaintiff alleged in the amended complaint that he pushed his emergency button and "asked the . . . officer working in the segregation bubble on first shift to please call H.S.U.

because the PLAINTIFF was being forced to eat, sleep and sit in urine." Dkt. No. 28 at ¶42. He later identified Price and Schmidt as the officers involved in this incident. Dkt. No. 60 at ¶6. The defendants assert that there is no record of the plaintiff calling the control center to complain about his linens that day, and that making such a request would have been inappropriate because soiled linens are not a medical emergency. Id. at ¶¶79-80.

The amended complaint indicated that the plaintiff finally received clean linen from Moore on December 14, 2014, because it was linen exchange day, but that Moore would not exchange his soiled blanket because only linen was being exchanged that day. Dkt. No. 28 at ¶43; Dkt. No. 60 at ¶7. The plaintiff had another incident between December 14 and December 17; he says that on the 17th, he asked Beahm for clean linen and a diaper, but was told that there were no diapers on the medical cart for the plaintiff and that "he no longer had a medical need for such diapers, or linen." Dkt. No. 28 at ¶44; Dkt. No. 60 at ¶8. The defendants argued that there were no diapers on the cart because the plaintiff failed to properly reorder them. Dkt. No. 117 at ¶85.

Although the plaintiff alleges that he notified health services several times that he did not have his special needs items, the defendants allege that the first time he specified that he was sleeping on urine-soiled linens was December 17, 2014. Id. at ¶87. The plaintiff responds that he should not have had to specifically state that he was soiling himself. Id. The plaintiff received clean bedding and briefs that same day. Id. at ¶86.

D.    *The Plaintiff's Migraine Claim*

The plaintiff had an appointment with DeYoung on January 21, 2015, to seek treatment for his headaches. Id. at ¶92. The plaintiff requested Excedrin Migraine, but that prescription had lapsed because he had not refilled it since July. Id. at ¶93. DeYoung noted that the plaintiff already was taking gabapentin, so she ordered acetaminophen, thinking that the plaintiff could treat his headaches by adding another medication that he could take with the gabapentin or in between doses of gabapentin. Id. at ¶94. (The plaintiff says he never got the acetaminophen. Id.) The plaintiff states that DeYoung told him that she would consult with Manlove about what other medications would be needed. Dkt. No. 113 at ¶95.

A little more than two weeks later, on February 6, 2015, DeYoung saw the plaintiff again to follow up on his headaches. Dkt. No. 117 at ¶96. The defendants assert that the plaintiff told DeYoung that the acetaminophen was not helping. Id. at ¶97. According to the plaintiff, DeYoung told him that she had forgotten to talk to Manlove about prescribing other medications to treat his migraines, dkt. no. 113 at ¶96, and he never got the acetaminophen, dkt. no. 113 at ¶97.

That same day, DeYoung spoke with Manlove, who orally prescribed Nortriptyline, which can be used to treat and prevent headaches. Dkt. No. 117 at ¶98. Although DeYoung put the order in the Prescriber's Orders, the order "did not make it" onto the plaintiff's Medication Profile. Id. at ¶99. As a result, the medication room never received the order, id. at ¶100, which meant that

Nortriptyline was never ordered from the pharmacy or delivered to the plaintiff, id. at ¶101.

About a week later, on February 12, 2015, and again on March 17, 2015, DeYoung had appointments with the plaintiff. Id. at ¶108. The defendants assert that the plaintiff did not complaint about not receiving the Nortriptyline at either appointment, dkt. no. 117 at ¶108; according to the plaintiff, he did not know that Manlove had ordered Nortriptyline, so he asked DeYoung if anything was being done about getting him medication for his migraines, dkt. no. 113 at ¶108. The plaintiff asserts that DeYoung told him that he had another surgery coming up that would hopefully cure the migraines. Id. The plaintiff also asserts that, on February 15, 2015, he asked Schrubbe if DeYoung had talked to the doctor about medication for his migraines. Id. at ¶106.

The plaintiff concedes that he saw other health care providers between February and May 2015, but he asserts that he did not know that Manlove had prescribed Nortriptyline. Id. at ¶109. The plaintiff further concedes that he was taking other pain medications during that time for his back condition, but he explains that they did not prevent his migraines from occurring nor did they help with the pain from his migraines. Id. at ¶¶110-111.

According to the defendants, inmates are told that, if their medications do not arrive within seven to ten days, they should contact health services to notify them of the delay. Dkt. No. 117 at ¶103. The plaintiff explains that he

did not know that Manlove had prescribed Nortriptyline, so he did not know there was a delay in it being delivered. Dkt. No. 113 at ¶103.

On May 9, 2015, more than three months after Manlove orally prescribed Nortriptyline, the plaintiff received a response to an inmate complaint he had filed. Id. at ¶105. The response indicated that Manlove had prescribed medication to address his migraines, but no one had ordered the medication. Id. That same day, the plaintiff sent a health services request to HSU, complaining that he had not received the medication. Dkt. No. 117 at ¶105. Health services received the request the next day and sent an order to the medication room on May 11, 2014. Id. at ¶¶105-106. The defendants assert that May 11, 2015 was the first time the medication room became aware that an order for Nortriptyline existed for the plaintiff. Id. at ¶105. The plaintiff received his first dosage of Nortriptyline on May 15, 2015. Id. at ¶107.

## II.    DISCUSSION

### A.    *Legal Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute

over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    *The Plaintiff's Voluntary Dismissals*

In his brief opposing the defendants' motion for summary judgment, the plaintiff agreed with the defendants that the court should dismiss his claims against Al-Rahrawy and Westphal in connection with his allegations that they failed to order the plaintiff's migraine medication, because neither of them were aware that Manlove had orally prescribed the medication. Dkt. No. 111 at 20. Second, the plaintiff agrees that the court should dismiss his state law claims against Manlove for medical malpractice, id. at 25, and should dismiss his state-law negligence claims against Al-Rahrawy and Westphal because he did not comply with Wis. Stat. §893.82 to file a notice of claim with the Attorney

16

General, id. at 26. The plaintiff acknowledges that Manlove did not know about the cancellation of the elevator pass or the denial of the plaintiff's special needs items, and he concedes that he did not name Al-Rahrawy and Westphal in the statutorily required Notice of Claim.

The court will grant summary in favor of these defendants on these claims.

C.     *The Plaintiff's Elevator Pass Claim against Manlove, Schrubbe and DeYoung*

The court allowed the plaintiff to proceed on a claim that Manlove, Schrubbe and DeYoung were deliberately indifferent to his serious medical need "based on their failures to enforce compliance with his elevator pass while he was in segregation . . . ." Dkt. No. 27 at 8. The court will grant summary judgment in favor of all three defendants on this claim.

1.     DeYoung

While it appears that DeYoung, a registered nurse, signed a form relating to the elevator pass, dkt. no. 105 at ¶6, it was the special needs committee that decided whether an inmate required a pass, dkt. no. 117 at ¶9. DeYoung was not on that committee, dkt. no. 105 at ¶6; Schrubbe was, dkt. no. 117 at ¶21. DeYoung neither approved nor discontinued the plaintiff's elevator pass. Dkt. No. 105 at ¶6. Schrubbe attests to the fact that she was the one who discontinued his pass. Dkt. No. 104 at ¶40. "To state a claim for individual liability under section 1983, a plaintiff must allege that the defendant was 'personally responsible for the deprivation of a constitution right' because '[s]he directed the conduct causing the constitutional violation, or it occurred with

[her] knowledge or consent." <u>Blossom v. Dart</u>, 64 F. Supp. 3d 1158, 1162 (N.D. Ill. 2014) (quoting <u>Sanville v. McCaughtry</u>, 266 F.3d 724, 740 (7th Cir. 2001)). DeYoung was not personally responsible for the cancelation of the plaintiff's elevator pass, and the court will dismiss this claim against her.

### 2. Manlove

The facts do not indicate that Manlove had any involvement in the issues surrounding the elevator pass. Manlove himself indicates that he did know until the plaintiff filed the lawsuit that the plaintiff was alleging that that he was involved. Dkt. No. 100 at ¶8. Manlove was not a member of the special needs committee, and he attests that that committee did not reach out to him about their decisions regarding the elevator pass. <u>Id.</u> at ¶¶9-10. Again, because Manlove was not personally involved in discontinuing the plaintiff's elevator pass, the court will dismiss this claim against Manlove.

### 3. Schrubbe

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains both an objective element—that the medical needs be sufficiently serious—and a subjective element—that the officials act with a sufficiently culpable state of mind. <u>Id.</u> To survive summary judgment the plaintiff must set forth sufficient evidence that a jury could reasonably conclude that he has proven each element of the standard.

The defendants argue that the plaintiff has not identified a genuine dispute as to a material question of fact on either prong. Regarding the objective prong, the defendants argue that the plaintiff has provided no medical evidence to support his assertion that he had a medical need for an elevator pass. Regarding the subjective prong, the defendants argue that Schrubbe was not deliberately indifferent to the plaintiff's medical needs; she exercised her medical judgment in deciding that the plaintiff did not require an elevator pass while in RHU. The plaintiff responds that the off-site specialist's recommendation that the plaintiff be housed on a lower tier "until further notice" is evidence that he was physically incapable of handling even the limited number of stairs in RHU.

The question of whether the plaintiff had a medical need for an elevator pass is not as clear as either party insists. In August 2014, the off-site specialist said that he was downgrading the plaintiff's tier level "to assist him with some of his [activities of daily living] requirements." Dkt. No. 100-1 at 258. When the specialist made that recommendation on August 1, 2014, the plaintiff was in general population, where there were many stairs, and he had recently suffered trauma to his back from falling down some stairs. The specialist noted that, "at this point, my plain is to manage him conservatively, see how his symptoms go . . . ." Id. It appears that the plaintiff was issued the elevator pass in October 2014 to address two medical issues: 1) the plaintiff's back condition, which made it physically difficult for him to navigate stairs;

and 2) his vertigo, which could make it dangerous for the plaintiff to navigate stairs on his own.

The specialist saw the plaintiff again on November 7, 2014, a month or so after the plaintiff received the elevator pass. Dkt. No. 100-1 at 251. In his notes summarizing the examination, the specialist noted, "[The plaintiff] is in no acute distress, arises easily from the chair, and ambulates freely about the room. He has difficulty with heel and toe walking secondary to pain. Lower extremity motor exam demonstrates 5 out of 5 strength throughout." Id. The specialist's plan included a steroid injection and adjusting the plaintiff's medication. He did not mention the lower-tier restriction he'd ordered in August.

Schrubbe says that one of the reasons she discontinued the elevator pass was because the off-site specialist didn't mention it in his November 7, 2014 report. The plaintiff insists that the off-site specialist's August order required him to have a low-tier restriction until further notice, and that the fact that the specialist did not explicitly cancel that order in his November 7 report means the order was still in effect. Both parties are drawing inferences from the reports; the specialist did not say clearly one way or the other how long he intended the low-tier restriction to last. It is also hard to tell from the off-site specialist's language in the August 1 report whether he felt that the plaintiff was physically incapable of using stairs. He did not say as much; he simply said that he was ordering a lower-tier restriction to help the plaintiff with his

activities of daily living. One could—as the parties have done—draw conclusions either way.

But even if the plaintiff had a medical need for an elevator pass in August and October, of 2014, the plaintiff has presented no evidence to support his claim that Schrubbe was deliberately indifferent to that need when she canceled the pass while the plaintiff was in the restrictive housing unit. Prison medical officials are "free to make [their] own, independent medical determination as to the necessity of certain treatments [], so long as the determination is based on the [prison official's] professional judgment and does not go against accepted professional standards." <u>Holloway v. Delaware Cty. Sheriff</u>, 700 F.3d 1063, 1074 (7th Cir. 2012). Schrubbe has provided four reasons why she decided the plaintiff did not need an elevator pass while in RHU, only one of which has to do with her reading of the off-site specialist's November 7 report. She also relied on the advice of the advanced care providers in the HSU, who indicated that the plaintiff had been seen navigating stairs while he was in general population. Whether that fact is true or not is not relevant to the question of whether Schrubbe had reason to believe that the plaintiff could manage stairs. She also based her decision on the fact that there were far fewer stairs in the RHU than there had been in general population—a fact that the plaintiff does not dispute. Because there were so many stairs in general population, it is reasonable for Schrubbe to have thought that the low-tier restriction he needed while housed there would not be necessary in a housing unit with far fewer stairs. Finally, she relied on the fact that in the

restricted housing unit, inmates did not go from place to place without an escort. She reasoned that if the plaintiff did have an issue on stairs while he was in that unit, there would be someone there to keep him from falling.

The plaintiff disagrees with Schrubbe's reasoning—he says he didn't go to a lot of the places in general population that required use of the stairs, and that he'd had an escort once before who'd allowed him to fall down the stairs—but he does not allege that Schrubbe knew these things. Further, his disagreement with Schrubbe's medical judgment is not "enough to prove deliberate indifference in violation of the Eighth Amendment." Berry v. Peterman, 604 F.ed 435, 441 (7th Cir. 2010) (citations omitted). When a medical professional exercises her judgment, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 263 (7th Cir. 1996) (citations omitted). The plaintiff presents no evidence from which a reasonable jury could conclude that Schrubbe's decision was such a substantial departure from the accepted standards of medical judgment or practice that Schrubbe did not base her decision on that judgment. The court will grant summary judgment in favor of Schrubbe on this claim.

D.    *The Plaintiff's Special Needs Items Claims against Manlove, Shrubbe and DeYoung*

The court also allowed the plaintiff to proceed on a deliberate indifference claim against Manlove, Schrubbe and Deyoung based on his allegations that

they failed to update his special needs slip before it expired, and thus were deliberately indifferent to his need for clean linens, blankets and briefs.

"A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions . . . . Deliberate indifference requires that the corrections officer must have 'actual knowledge' of the risk." Grieveson v. Anderson, 538 F.3d 763, 776 (7th Cir. 2008) (citations omitted).

The plaintiff states that he told Manlove on November 21, 2014 that his restrictions were about to expire; he notified DeYoung on December 5, 2014 that his restrictions were set to expire that day; and he notified Schrubbe on December 17, 2014 that his restrictions had expired nearly two weeks earlier. Schrubbe updated the plaintiff's restrictions the same day she learned they had expired. The plaintiff also asserts that he wrote to health services on December 5 and 14, 2014 to notify them that his restrictions had not been updated, but he does not provide any evidence showing that Manlove, DeYoung or Schrubbe read either of those requests.

### 1. DeYoung

DeYoung reiterates that she wasn't on the special needs committee, the body responsible for approving requests like special linen needs. Dkt. No. 105 at ¶12. She emphasizes that it was the plaintiff's responsibility to notify that committee a month before any special needs restriction expired. Id. at ¶16. More to the point, however, DeYoung points out that the records indicate that on December 5, 2014, she *did* renew the linen exchange request, as the

plaintiff had asked her to do. Id. at ¶20. The defendants included that record, dkt. no. 100-1 at 146; it is a Medical Restrictions/Special Needs form dated December 5, 2014 and signed by DeYoung. Under the section marked "Offender to Have in His/Her Possession the Following Items/To Remain at Facility," DeYoung marked the box for "Other," and wrote, "May request linen change as needed." Id. Under the "start" date, she wrote December 5, 2014; under the "stop" date, she wrote March 5, 2015. Id. DeYoung says she either would have hand-delivered the form to the RSU, or put it in inter-office mail. Dkt. No. 105 at ¶21. She concedes that it is possible that the form somehow didn't make it into the RSU binder; that wasn't her job, and she says if it didn't make it into the binder, it was a mistake. Id. at ¶22.

The plaintiff accuses DeYoung of lying, but an unsupported allegation is not sufficient to create a genuine dispute as to an issue of material fact sufficient to default summary judgment. The court will grant summary judgment in favor of DeYoung on this claim.

2.     Manlove

While the plaintiff says that on November 21, 2014 he notified Manlove in person that he needed additional linens, the record does not contain evidence to support that claim. The medical records have an entry for November 21, 2014—that entry talks about the fact that the UW spine clinic saw the plaintiff, the fact that the plaintiff was wondering why his eye appointment was canceled, it mentions "lumbar spine stenosis," and says that an ESI will be ordered. Dkt. No. 100-1 at 17. It makes no mention of linens

24

that the court can see. There is a prescriber's order dated November 21, 2014; the prescriber's signature starts with the letter "M," so perhaps Manlove was the prescriber. Id. at 38. The order says only to schedule the plaintiff for an L-4-5 epidural steroid injection as recommended by the University of Wisconsin; again, there is no mention of linens. Id.

Like DeYoung, Manlove points out that he was not on the special needs committee, and that committee would have handled the extension of the September 5, 2014 linen restriction. Dkt. No. 100 at ¶9. He concedes that he had an appointment with the plaintiff on November 21, 2014, but says that the plaintiff did not bring up the linen exchange at that appointment. Id. at ¶¶16-17. Manlove does not dispute, however, that if the plaintiff had raised the issue with him, he had the power to write an order for the linen exchange, which the special needs committee could have decided on at its next meeting. Id. at ¶12.

There is a factual dispute as to whether the plaintiff did or did not tell Manlove on November 21, 2014 that he needed the linen exchange restriction renewed. The fact-finder—the jury—would need to determine whose version of events was more credible—Manlove's or the plaintiff's. The court will deny Manlove's motion for summary judgment on this issue.

3. <u>Schrubbe</u>

The plaintiff does not allege that he notified Schrubbe prior to the linen exchange restriction expiring. His argument is more that she should have known that he was soiling his linens. Schrubbe indicates that she did not become aware that the plaintiff had been complaining about the linen exchange

until December 17, 2014—two weeks *after* the restriction had expired—and on that date, someone (there appears to be a word missing from Schrubbe's declaration) approved clean bedding as needed. Dkt. No. 104 at ¶¶52-53. Even if true, the plaintiff's allegation that Shrubbe should have known he was soiling his linens because it was general knowledge does not mean that Shrubbe knew that his linen exchange restriction was due to expire on December 5, 2014. The whole reason that inmates have to make their restriction requests to the special needs committee is because, with 1,200 inmates in the facility, it is impossible for staff to remember when each inmate's restrictions are to expire. Id. at ¶16. It is undisputed that Shrubbe did not find out that the plaintiff's linen restriction had expired until two weeks later, at which time the restriction was renewed. No reasonable jury could conclude that Schrubbe allowed the plaintiff's linen exchange restriction to expire. The court will grant summary judgment in favor of Schrubbe on this clam.

E. *The Plaintiff's Conditions of Confinement Claim against Bleiler,*
   *Marwitz, Moore, Beahm, Price and Schmidt*

The plaintiff asserts that, after his special needs restrictions expired, he was unable to obtain clean clothes, linens and blankets after he urinated on them as a result of his medical condition. To prevail on an Eighth Amendment conditions of confinement claim, the plaintiff must show that the defendants denied him "the minimal civilized measure of life's necessities." Gillis v. Litscher, 468 F.3d 488, 491 (7th Cir. 2006). A defendant may be held liable under this standard only if he knew the inmate faced a substantial risk of

serious harm and that he disregarded that risk by failing to take reasonable steps to address it. Id.

The defendants first argue that they are entitled to summary judgment on this claim because requiring an adult to sleep on urine-soaked sheets and blankets for nearly a week is not objectively serious enough to give rise to a constitutional claim. The defendants rely on DeSpain v. Uphhoff, 264 F.3d 965, 974 (10th Cir. 2001), for the proposition that the "circumstances, nature, and duration" of the condition must be analyzed to determine whether they were sufficiently serious. That case holds that "[i]n general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations of shelter, food, drinking water, and sanitation' may meet the standard despite a shorter duration." Id.

The defendants' choice of this case to support their argument for summary judgment is curious. First, the defendants fail to mention that the Tenth Circuit went on to note that "exposure to human waste carries particular weight in the conditions calculus." Id. This is because "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in Farmer [v. Brennan, 511 U.S. 825 (1994)] and the more general standards of dignity embodied in the Eighth Amendment." Id. In fact, the Seventh Circuit has cited the DeSpain decision for the proposition that "exposure to human waste, even for 36 hours, would constitute sufficiently serious deprivation to violate Eighth Amendment." Vinning-El v. Long, 482

F.3d 923, 924 (7th Cir. 2007). <u>See also</u>, <u>Wheeler v. Walker</u>, 303 Fed. App'x 365, 368 (7th Cir. 2008) (citing <u>DeSpain</u> as having "expressed specific concern about exposure to human waste for periods as short as 36 hours"). The Seventh Circuit seems to view the <u>DeSpain</u> decision much differently than do the defendants.

The Seventh Circuit reversed a grant of summary judgment in a case where a prisoner claims that for two weeks, prison guards "ignored his requests for cleaning supplies while he was exposed to a combination of heavy roach-infestation, filth, and human waste." <u>Wheeler</u>, 303 Fed. App'x at 368. It has held that allegations of "unhygienic conditions, when combined with the jail's failure to provide detainees with a way to clean for themselves with running water or other supplies," states a claim for relief based on unconstitutional conditions of confinement. <u>Budd v. Motley</u>, 711 F.3d 804, 843 (7th Cir. 2013).

The Seventh Circuit also has found unconstitutional conditions of confinement in other situations where a prisoner was exposed to human waste for shorter periods. For example, in <u>Johnson v. Pelker</u>, the court said that it was "unable to conclude with certainty that placing a prisoner in a cell for three days without running water and in which feces are smeared on the walls while ignoring his requests for cleaning supplies and for the water to be turned on fall with in the 'civilized standards, humanity, and decency' recognized in this circuit." <u>Johnson v. Pelker</u>, 891 F.2d 136, 139 (7th Cir. 1989).

It is true that courts do not view an allegation of an unsanitary condition in a vacuum; courts also consider the length of time the plaintiff was exposed, the issue of whether the plaintiff himself caused the condition, the plaintiff's ability to address the condition himself, and other factors. For example, at the screening stage, Judge Stadtmueller found that "sleeping on a filthy, urine-soaked mattress on the floor, and being forced to do so each night despite being bitten by bugs coming out of a floor drain, suffices to state a claim under the Eighth Amendment based on conditions of confinement." Osborne v. Wis. Dep't of Corr., Case No. 17-cv-754, 2017 WL 2880545 at *3 (E.D. Wis. July 6, 2017) (citations omitted). At summary judgment, the plaintiff was not able to support his claim that his cellmate had caused his mattress to be soaked with urine, and Judge Stadtmueller found that the plaintiff could have moved his mattress away from the urinating cellmate. Osborne v. Meisner, Case No. 17-cv-754, 2018 WL 1953926 at *6 (E.D. Wis. April 25, 2018). Judge Stadtmueller also found that because the plaintiff was exposed to the "unpleasant" conditions (a bug infestation, a rash, sharing a cell with a shower and a urinating cellmate) for only a week and a half, his claim did not trigger constitutional protections. Id. at *7.

On the other hand, Judge Peterson concluded that a plaintiff's claim that he did not have a functioning toilet survived summary judgment, despite the defendants' argument that the "inconvenience" was "temporary." Linsey v. Esser, Case No. 14-cv-357, 2015 WL 5032659 at *4 (Aug. 25, 2015). While conceding that the plaintiff's allegations did not involve conditions as extreme

as those in <u>Vinning-El</u> or <u>Johnson</u>, Judge Peterson observed that a jury could view the evidence and conclude that the conditions the plaintiff suffered were constitutionally inadequate. <u>Id.</u>

The defendants undermine their own argument that allegedly minimal exposure to human waste does not pose a significant risk to health and safety and therefore is not objectively serious enough. They assert that, "[I]f an inmate were to show Defendants that they had soiled either their linens or a blanket, Defendants would give him fresh linens and a blanket as needed [because] [i]f an inmate has soiled linens or a blanket, it puts their own safety and health in jeopardy being on the unit." Dkt. No. 117 at ¶¶66-67. This argument implicitly acknowledges what the <u>DeSpain</u> court held—and what the Seventh Circuit has noted—that even limited exposure to human waste can constitute an unconstitutional condition of confinement.

The defendants also argue that the plaintiff's exposure to urine-soiled linens and blankets over the course of a week is not objectively serious enough because he could have washed his linens and blankets in his cell sink. According to the plaintiff, however, the sinks in restricted housing cells are no bigger than a cereal bowl, making washing linens and blankets unworkable. Dkt. No. 111 at 23.

The court concludes that the plaintiff has identified a genuine dispute of material fact as to whether sleeping in urine-soiled linens and blankets for a week was an objectively serious condition of confinement.

As to the subjective prong, the defendants argue that the evidence establishes that they were not deliberately indifferent to the plaintiff's conditions of confinement. Defendants Bleiler, Marwitz, Price, Schmidt and Moore assert that they did not "know" that the plaintiff's linens and blankets had been soiled because they never actually saw them. The defendants explain that the plaintiff only *told* them about his soiled linens and blankets—he never *showed* them the soiled linens and blankets. They argue that they are under no obligation to take an inmate at his word, especially given that many inmates lie in order to manipulate the officers. The plaintiff responds that his special restriction orders had been in place for a significant time and that each of these defendants was aware of his incontinence issues, so all of them had little reason to doubt his claims about his soiled linens and blanket.

The court concludes that a dispute of material fact exists as to whether the defendants were aware of the health and safety risk the plaintiff faced. The court notes that the defendants cannot avoid liability for deliberate difference by sticking their heads in the sand. See *e.g.*, Farmer, 511 U.S. at 843 n.8. Although the defendants did not have to take the plaintiff at his word that he was sleeping on urine-soiled linens and blankets, given their knowledge of the plaintiff's incontinence issues, a jury could reasonably conclude that they should have confirmed whether the plaintiff's statements about his linens and blanket were true and needed to be addressed. Id.

Nor are the defendants entitled to summary judgment based on their argument that policy prohibited them from providing the plaintiff with the

items he requested. The defendants undermine this argument by noting that, "to the extent that any of the security Defendants saw that [the plaintiff's] linens or blankets actually had urine on them, each would have provided him with a clean set not only for [the plaintiff's] safety and health, but for their own safety and health, as well as the safety and health of their co-workers and other inmates." Dkt. No. 118 at 6.

The defendants cannot have it both ways—they cannot assert that if only they had known, they would have handed out clean linens while also asserting that policy prohibited them from handing out clean linens without exception. A jury could reasonably conclude that the policy the defendants cite did not prevent them from supplying the plaintiff with the items he requested. Even if policy did prohibit the defendants from exchanging the plaintiff's linens or providing him with items he requested, the Constitution trumps institution policy. Individuals are not free to violate an inmate's constitutional rights simply because a policy suggests it is permissible to do so.

Specifically regarding Bleiler: the plaintiff says that on December 9, 2014 while in the shower, he told Bleiler that he was sleeping in soiled sheets. The court has rejected Bleiler's claim that because he didn't actually see the sheets and blanket himself, he didn't "know" that the plaintiff needed a linen exchange.

As to Marwitz: in the amended complaint, the plaintiff alleged that on December 11, 2014, he'd awakened to soiled sheets, and had pushed the medical emergency button and asked the officer working "in the segregation

bubble on the first shift," to call the HSU because the plaintiff "was being forced to eat, sleep and sit in urine." Dkt. No. 28 at ¶42; Dkt. No. 60 at ¶5 (identifying the John Doe officer involved in the incident as Marwitz). In his declaration, the plaintiff stated that "Marwitz was on the range during medication hand out, and that was when he told the plaintiff that there was no longer an approved special needs slip so therefore he could not replace the soiled linens. Plaintiff the[n] pushed the medical emergency button and spoke with Schmidt . . . ." Dkt. No. 113 at ¶76. The defendants argue that "[p]laintiff cannot now change his story for the purpose of creating a dispute of fact." Dkt. No. 117 at ¶76. The defendants put much stock in a minor inconsistency—if it is even an inconsistency. The plaintiff has consistently asserted that he had a conversation with Marwitz. Inconsistencies about when or how that conversation occurred eventually may be relevant to the plaintiff's credibility, but they do not require that the court disregard the plaintiff's statements on summary judgment, especially because the plaintiff has not had an opportunity to explain the inconsistencies. See Bank of Ill. v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168-70 (7th Cir. 1996).

As to Price and Schmidt: the plaintiff says he pushed the emergency button on December 11, 2014 and told the officers in the bubble that he needed linens. Schmidt and Price respond that there is no record of the plaintiff pushing the button. This is a factual dispute, to be resolved by a jury.

As to Moore: the plaintiff says that on December 14, 2014, Moore *did* give him clean linen, because it was linen exchange day, but refused to give the

plaintiff a clean blanket because the only items being exchanged that day were linens. The court already has rejected this policy defense (if that is what it is).

Because a genuine dispute of material fact exists on both the objective and subjective prongs of the deliberate indifference standard, defendants Bleiler, Marwitz, Price, Schmidt and Moore are not entitled to summary judgment on the plaintiff's conditions of confinement claim.

Nor are these defendants entitled to qualified immunity on this claim. The defendants argue that there is no case on point that would have warned these defendants that they would violate the plaintiff's constitutional rights if they followed the institution's policies, which did not allow them to hand out linens and blankets without a special restriction on file. They also argue that there is no case on point that demonstrates that they would have known that they were violating the plaintiff's rights by refusing to provide him clean linens and blankets when they did not have actual knowledge that his linen and blanket were soiled.

The defendants' qualified immunity argument sets up a false premise. The institution policy is not why they refused to provide the plaintiff with the requested items. They refused to provide him with the requested items because they did not follow up when he told them that he needed the items. Their failure to confirm or investigate the plaintiff's representations does not shield them from liability. These defendants are not entitled to qualified immunity.

The court will grant summary judgment in favor of Beahm. According to the evidence, the plaintiff notified Beahm on December 17 that he needed clean

linens and an adult diaper; he received those items later that day. Dkt. No. 117 at ¶¶84-86. Although Beahm did not provide the plaintiff with the requested items immediately (indicating that there were no diapers on the medical cart for the plaintiff, and that he no longer had a restriction), the plaintiff was not harmed by the delay because he did not have to sleep on or wear the urine-soiled items before he received replacement items. Because the plaintiff was not exposed to any harm in the few hours between the plaintiff's request and the plaintiff receiving the requested items, Beahm is entitled to summary judgment.

### F. *The Plaintiff's Migraine Claim against DeYoung*

The court allowed the plaintiff to proceed on a claim against DeYoung, based on his allegations that she delayed ordering medication for his migraines. Dkt. No. 27 at 8. DeYoung explains that, on January 21, 2015, she had an appointment with the plaintiff to discuss treatments for his migraines. Dkt. No. 105 at ¶28. This is when she added acetaminophen to the medication he already was taking (gabapentin). Id. She saw him again, about two weeks later, on February 6, 2015. Id. at ¶30. When the plaintiff told DeYoung that the acetaminophen hadn't helped, she discussed the plaintiff's migraines with Manlove, who orally prescribed Nortriptyline, which is a medication that both prevents and treats migraines. Id. DeYoung says that she placed the order in the Prescriber's Orders, but that the order "did not make it into" the plaintiff's medication profile, so the medication room did not order the medication from the pharmacy. Id. DeYoung says that this was a mistake, stating, "I am

human, and I do make mistakes." Id. at ¶31. The order for the Nortriptyline was placed on May 10, 2015, months later.

DeYoung argues that she was not deliberately indifferent to the plaintiff's serious medical conditions—she made a mistake, and making a mistake does not violate the Constitution. Generally, this is true. But there are other facts that create a genuine dispute as to whether the delay in the plaintiff receiving his medication was due to a mistake or was a result of deliberate indifference.

The plaintiff acknowledges that at his first appointment with DeYoung on January 21, 2015, she told him that she would check with Manlove (his primary physician) "about what kind of medication would be needed." Dkt. No. 113 at ¶95. The plaintiff declares that when he went back to DeYoung on February 6, however, she told the plaintiff that she had forgotten to ask Manlove about recommendations for other medications. Id. at ¶96. The medical records seem to support this. The chart notes from February 6, 2015 indicate that the plaintiff told DeYoung that the acetaminophen was ineffective, *then* states, "[d]is HA [headache] issue w/Dr. Manlove Nortriptyline order rec'd." Dkt. No. 100-1 at 15. The prescriber's orders show that on February 6, 2015, Manlove prescribed 25 mg. of Nortriptyline by mouth for three months. Id. at 35. So the plaintiff saw DeYoung, then DeYoung saw Manlove, then Manlove prescribed the Nortriptyline—*after* the plaintiff's appointment with DeYoung.

This fact is relevant to defendants' argument that inmates are supposed to tell staff if they aren't getting their prescribed medication, and that the plaintiff never told anyone that he wasn't getting the Nortriptyline. The plaintiff

36

explains that he met with DeYoung two more times, on February 12 and March 17, 2015. Dkt. No. 113 at ¶108. DeYoung does not dispute this. Dkt. No. 105 at ¶36. According to the plaintiff, at these appointments, he asked DeYoung if anything was being done about getting medication for his migraines. Dkt. No. 113 at ¶108. The plaintiff states that she told him to wait for his upcoming surgery, which hopefully would help. Id.

DeYoung does not address the plaintiff's claim that he asked her—twice—about headache medication. Rather, she focuses on the fact that the plaintiff did not notify her or other staff that he was not getting the Nortriptyline—she says that if he had told her he wasn't getting it, she would have ordered it for him, dkt. no. 105 at ¶32; she says that the plaintiff did not state in any of his HSU requests that he wasn't getting the Nortriptyline, id. at ¶33; she says that he did not tell her at the appointments on February 12 and March 17 that he was not getting the Nortriptyline, id. at ¶36; and she says that he never complained to other members of the HSU staff that he was not getting the Nortriptyline, id. at ¶37. The problem with DeYoung's arguments is that they assume that the plaintiff *knew* that Manlove had placed an order for Nortriptyline on February 6, 2015. There is nothing in the record to indicate that the plaintiff was aware of Manlove's order, and the plaintiff says that he did not find out about the prescription until May 8, 2015, when a response to an inmate complaint informed him of it. Dkt. No. 113 at ¶105. Even DeYoung does not state that she notified the plaintiff that Manlove had issued a prescription for him.

The plaintiff's claim that he asked DeYoung in February and March about headache medication is uncontested. Yet it appears that DeYoung did not tell him that Manlove had issued a prescription, and did not check to find out why the plaintiff was not receiving the medication Manlove had prescribed. A reasonable jury could look at these facts and conclude that DeYoung was deliberately indifferent to the plaintiff's migraine pain.

DeYoung also says that that between February and May, the plaintiff was taking other medication "that would assist with his headaches." Dkt. No. 105 at ¶38. She says that the plaintiff's gabapentin prescription was increased on March 25, 2015 (more than a month and a half after the February 6, 2015 appointment); that he received Norco (a combination of hydrocodone and acetaminophen) on April 3, 2015 (almost two months after the February 6 appointment); that he received Oxycodone and acetaminophen on April 7, 2015 (again, two months later); and that he received Naproxen on April 24, 105. Id. at ¶39. DeYoung asserts that all of these medications "would have similar headache relieving qualities as Nortriptyline." Id.

DeYoung does not address the fact that between February 6, 2015 and March 25, 2015, the plaintiff did not have medication for the migraines, nor does she does address the fact that twice during that period, the plaintiff says that he asked her what was going on with his migraine medication.

There is a genuine dispute as to whether DeYoung was deliberately indifferent to the plaintiff's medical need regarding his migraines, and the court will deny summary judgment on that claim.

G.   *The Plaintiff's Medical Malpractice Claims against Schrubbe and DeYoung*

The court allowed the plaintiff to proceed on state-law malpractice claims against Manlove, Schrubbe and DeYoung. Dkt. No. 27 at 9. As the court noted above, the plaintiff agrees that the court should grant summary judgment as to Manlove on this claim. Dkt. No. 111 at 25.

The defendants argue that the court must dismiss the plaintiff's malpractice claims against Schrubbe and DeYoung as a matter of law because neither is a "health care provider" covered by the state medical malpractice statute. Dkt. No. 98 at 28. The defendants explain that Wis. Stat. §665 is the exclusive remedy for medical malpractice claims in Wisconsin and that chapter authorizes such actions only against "health care providers." Id. The statute defines health care providers, in part, as "physicians, nurse anesthetists, partnerships of physicians and nurse anesthetists, nursing homes, and corporations for the primary purpose of providing medical services of physicians or nurse anesthetists." Id. (citing Wis. Stat. §655.002(1)). The defendants emphasize that the list does not include registered nurses (DeYoung) or Health Service Managers (Schrubbe). Id.

The plaintiff disagrees that Schrubbe and DeYoung are not health care providers. Dkt. No. 111 at 24. He argues that they functioned as health care providers because they made decisions that only a health care provider was entitled to make. Id. He argues that the court should treat Schrubbe and DeYoung as health care providers even if their official titles don't appear in the statute. The plaintiff does not cite any case law to support his argument.

Judge Conley in the Western District has rejected the defendants' argument that Wis. Stat. §655 prohibits malpractice claims against people whose jobs aren't listed in that statute. Judge Conley pointed out in <u>Carter v. Griggs</u>, Case No. 16-cv-252, 2018 WL 1902885 at *6 (W.D. Wis. Apr. 20, 2018) that Chapter 655 is not the exclusive remedy for medical malpractice claims; it is the exclusive remedy for malpractice claims against the health care providers defined in the statute. Judge Conley found no authority "precluding a plaintiff from pursing a common law medical malpractice claim against a state-employed individual *not* covered by § 655." <u>Id.</u> at 7. The question, then, is whether the plaintiff has created genuine disputes as to whether Schrubbe and DeYoung committed common-law medical malpractice.

To prevail on a medical malpractice claim, the plaintiff must prove four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. <u>Carter</u>, 2018 WL 1902885 at *6 (citing <u>Paul v. Skemp</u>, 242 Wis.2d 507, 520 (2001)). The plaintiff argues that Schrubbe and DeYoung committed malpractice because they "failed to continue the plaintiffs elevator pass, that was approved by a specialist . . . while the plaintiff was in restrictive housing unit." Dkt. No. 111 at 24. The court already has discussed the fact that the off-site specialist's order was not clear, so it is not clear that either Schrubbe or DeYoung owed the plaintiff a duty to continue the elevator pass. Without a duty, there can be no breach of duty, and no proof of malpractice.

The plaintiff also claims that DeYoung committed malpractice for "failure to provide medical treatment for the Plaintiffs migraine headaches." <u>Id.</u> at 4.

The plaintiff alleges that DeYoung "violated her work rules and responsibilities as a medical professional" when she failed to put Manlove's medication order in the plaintiff's medication profile, dkt. no. 113 at ¶99; this amounts to a negligence claim. He also alleges that she failed to follow through on making sure he received medication for his migraines, id. at ¶100; again, this amounts to a negligence claim. "[N]egligence and medical malpractice claims require proof of the same four elements . . . ." Carter, 2018 WL 1902885 at *6. The plaintiff has demonstrated that DeYoung owed him a duty to get him the medication Manlove had prescribed. He has demonstrated that she breached that duty, by failing to put the order in his medical profile and failing to follow upon his questions about migraine medication. He has alleged that he suffered harm—at least a month and a half of migraine pain due to lack of targeted medication. the same holds true for the plaintiff's medical malpractice claim against DeYoung. The court will deny DeYoung's motion for summary judgment as to the plaintiff's common-law medical malpractice claim.

## III.   SUMMARY

The court will grant the defendants' motion for summary judgment as to defendants Schrubbe, Al-Tahrawy, Westphal and Beahm.

The court will grant Manlove's motion for summary judgment as to the elevator pass claim and the common-law malpractice claim, but will deny the motion as to the plaintiff's claim that Manlove was deliberately indifferent to his special need to have his linen exchange restriction extended.

The court will deny DeYoung's motion for summary judgment as to the plaintiff's Eighth Amendment deliberate indifference claim and as to the common-law medical malpractice claim.

The court will deny the motion for summary judgment on the plaintiff's conditions-of-confinement claim against Bleiler, Marwitz, Price, Schmidt and Moore.

## IV.   MOTIONS TO APPOINT COUNSEL

On September 4, 2018, the defendants filed a document entitled "Defendants' Supplemental Authority in Support of Defendants' Motion for Summary Judgment." Dkt. No. 129. They reported that on August 20, 2018, Judge Conley had granted the defendants' motion for summary judgment in Oswald v. Pollard, et al., Case No. 15-cv-291-wmc (W.D. Wis.). Id. at 1. This document described the claims the plaintiff had raised in the case before Judge Conley. Id. at 1-2. They informed this court that Judge Conley had ruled in favor of the defendants in that case on a conditions of confinement claim, and that he had found three of the defendants in that case protected by qualified immunity. Id. at 2. They concluded by stating that based on Judge Conley's holding, "it would not be clear to someone in each of the Defendants' positions in this case that they would violate [the plaintiff's] rights by their actions," and asserted that the defendants in the case before this court are entitled to qualified immunity. Id.

On September 19, 2018, the court received from the plaintiff a "request for clarification, for appointment of counsel and further instructions about

42

defendants supplemental authority motion for summary judgment." Dkt. No. 131. The plaintiff asked the court to appoint him counsel for the "supplemental authority" the defendants filed on September 4, 2018. Id. at 1. He also noted that he'd moved to another institution, which meant that he no longer had the assistance of "jailhouse" lawyers. Id. at 1. He said he did not understand how "2 separate cases in 2 separate courts (districts) with different 'legal arguments' and situations can be ruled on using the same facts." Id. at 2. He said he was "confused and unsure what to do." Id. at 3.

On December 13, 2018, the court received a letter from the plaintiff, reiterating his request that the court appoint a lawyer in this case and in Oswald v. Manlove, et al., Case No. 17-cv-1437-pp (E.D. Wis.). Dkt. No. 133.

The court will grant the plaintiff's motions to the extent that they ask the court to appoint a lawyer to represent him in this case. Because the plaintiff has claims that have survived summary judgment, the court agrees that he will need help navigating the next steps in the litigation process. The court will recruit counsel to represent the plaintiff in this case. Once the court has found an attorney willing to represent the plaintiff, the court will provide the plaintiff with an agreement, which he can sign if he agrees to accept representation under the conditions the court provides. Once counsel is on board, the court will set up a scheduling conference with the lawyers, to discuss next steps.

As to the plaintiff's confusion about the "supplemental authority" that the defendants filed on September 4, 2018, the court shares his confusion. The court has great respect for Judge Conley, but his decisions are not binding on

this court. The facts in the case before Judge Conley were different than the facts before this court. Most of the defendants are different. The fact that Judge Conley granted summary judgment on the facts of the case before him does not dictate this court's ruling on the claims before it.

Finally, if the plaintiff wants the court to appoint counsel in Case No. 17-cv-1437, he must file a motion *in that case.* The court notes, however, that that case is in a different procedural posture than this one. The deadline for completing discovery in that case was to expire on February 1, 2019; the plaintiff has filed a motion to extend that deadline, as well as a motion to compel. Despite his having been moved to a different institution, and although he indicated in September that he did not have the assistance of jailhouse lawyers any longer, he seems to be representing himself vigorously in 17-cv-1437. He now has been through this process at least three times (once in the Western District, twice here), and knows how discovery and dispositive motions work.

## V.    CONCLUSION

The court **AMENDS** its June 12, 2017 order, dkt. no. 64, granting the plaintiff's request to substitute the real names for the John Doe placeholders, dkt. no. 60. The court **ORDERS** that, in addition to the defendants previously substituted, the clerk of court shall substitute Tim Price and Brian Schmidt for John Doe.

The court **GRANTS** the defendants' motion for summary judgment as to defendants Schrubbe, Al-Tahrawy, Westphal and Beahm, and **DISMISSES**

those defendants. The court **DENIES** the defendants' motion for summary judgment as to defendants Manlove, Bleiler, Marwitz, Moore, Price, Schmidt and DeYoung. Dkt. No. 97.

The court **GRANTS** the plaintiff's motions to appoint counsel in this case. Dkt. Nos. 131, 133.

Dated in Milwaukee, Wisconsin this 6th day of February, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**